UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMAN'S ASSOCIATIONS, et al., | No. C 02-2006 SBA |
| | **ORDER** |
| Plaintiffs, | [Docket No. 453, 454] |
| YUROK TRIBE, et al., | |
| Intervenors, | |
| v. | |
| UNITED STATES BUREAU OF RECLAMATION, et. al., | |
| Defendants, | |
| and | |
| KLAMATH WATER USERS ASSOCIATION, | |
| Defendant-Intervenors. | |

This matter comes before the Court on Defendant-Intervenor Klamath Water Users Association's Motion for Reconsideration [Docket No. 453] and Defendants U.S. Bureau of Reclamation and National Marine Fisheries Service's (collectively, the "Federal Defendants") Federal Rule of Civil Procedure 59(e) Motion to Alter or Amend Judgment or, in the Alternative, Motion for Leave to File Motion to Reconsider. Having read and considered the papers submitted by the parties and being fully informed, the Court finds this matter appropriate for resolution without a hearing. The Court hereby GRANTS Defendant-Intervenor's Motion for Reconsideration and GRANTS the Federal Defendants' Motion to Alter or Amend Judgment.

///

**BACKGROUND**

The instant litigation focuses on the operation of the Klamath Reclamation Project ("the Project") for the years 2002 through 2012. The U.S. Bureau of Reclamation (the "BOR") manages the Klamath Reclamation Project, which covers approximately 200,000 miles in Northern California and Southern Oregon. Water collects in the Upper Klamath Lake ("UKL"), which is relatively shallow and has a limited storage capacity available for use during dry years. Water is drawn from UKL into the Project via the A-canal, which sits above Link River Dam. Link River Dam regulates the flow of water into the lower Klamath River. Link River Dam is the first in a series of dams in the Project, the last being the Iron Gate Dam. From Iron Gate Dam, the Klamath River flows into the Pacific Ocean.

The BOR determines the level, timing, and rate of water flow through the Klamath Project. In managing the Project, the BOR must balance many interests and obligations, all potentially competing for the same valuable, but limited, resource. Pursuant to contracts authorized by the Reclamation Act, the Project provides irrigation water to farmers and communities in the area. Additionally, water from the Project supports two national wildlife refuges, the Lower Klamath and Tule Lake National Wildlife Refuges. The BOR must also preserve the tribal resources of three Native American Tribes whose territory falls within the Project: the Hoopa, Klamath, and Yurok Tribes. The preservation of tribal resources includes protection of the coho salmon and maintaining the tribes' water rights. Additionally, the Project must comply with the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, because its territory encompasses the habitat of the Southern Oregon/ Northern California Coasts ("SONNC") coho salmon (hereinafter referred to as the "coho salmon"), a threatened species under the Endangered Species Act. *See* 62 Fed.Reg. 24588, 24592 (May 6, 1997). The coho salmon populate the waters below the Iron Gate Dam in the Klamath River and its tributaries. The Klamath River from Iron Gate Dam to the Pacific Ocean has been designated critical habitat for the coho salmon.

Under the ESA, the Project is prohibited from engaging in any action that is likely to "jeopardize the continued existence of" an endangered or threatened species or result in "destruction or adverse modification of [the designated critical habitat]." 16 U.S.C. § 1536(a)(2). An action "jeopardizes the continued existence" of a species when the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by

reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. An action results in "destruction or adverse modification" when the action results in a "direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id.*

Whenever an agency undertakes an action that "may affect" a species listed as threatened under the ESA, it must pursue consultation with the United States Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service (the "NMFS"). The agency proposing the action (the "acting agency") may prepare a "biological assessment" ("BA") to evaluate the potential effects of a proposed action. 50 C.F.R. § 402.12(a). As part of the formal consultation process, the consulting agency will issue a "biological opinion" detailing how the proposed action will affect the listed species. 16 U.S.C. §1536(b)(3)(A). If the NMFS or the FWS determines that the agency action will jeopardize or adversely modify the species or its critical habitat, the NMFS or the FWS will suggest reasonable and prudent alternatives ("RPAs") that "avoid the likelihood of jeopardizing the continued existence of listed species or result in the destruction or modification of critical habitat." 50 C.F.R. § 402.02; *see also* 16 U.S.C. §§ 1536(a)(2) and (b)(3)(A). In evaluating whether a proposed action is likely to avoid jeopardy or destroy or modify a critical habitat, the NMFS or the FWS must evaluate the "effects of the action," along with the "cumulative effects" on the species. 50 C.F.R. § 402.14(g)(3). "'Effects of the action' refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02. The environmental baseline includes "the anticipated impact of all proposed Federal projects in the action area that have already undergone . . . consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.* Indirect effects are those that are "caused by the proposed action and are later in time, but are still reasonably certain to occur." *Id.* "'Cumulative effects' are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

Beginning in 1995, the BOR began issuing annual operating plans detailing, *inter alia*, the minimum flow levels in the Klamath River below the Iron Gate Dam. The plans specifically provided

for flows in terms of cubic feet per second ("cfs") of water. The flows were planned upon weekly or monthly periods, based upon hydrological conditions for the year; *e.g.*, "Above Average," "Below Average," "Dry," and "Critically Dry." These classifications were based upon estimates received from the Natural Resources Conservation Service ("NRCS"). Generally, the accuracy of the estimates increased in temporal proximity to the planned action.

In the years following 1995, the BOR engaged in the process of preparing a multiple-year operating plan, including a biological assessment as required under the ESA. Before issuing the multi-year plan, the BOR consulted with Thomas Hardy, Ph.D. of the NMFS, to complete a comprehensive review of the status of all anadromous[1] fish in the Klamath River. In August 1999, Dr. Hardy released "Phase I" of his report, ("Hardy Phase I Report"), which recommended certain interim minimum flow levels necessary to protect the anadromous fish in the Klamath River. However, because further testing and analysis was needed, the Hardy Phase I Report was only an interim report.[2]

In 2000, the BOR issued an operating plan (the "2000 Plan") which instituted various flow levels. However, the BOR did not seek formal consultation of the plan as required by the ESA. Accordingly, the Pacific Coast Federation of Fishermen's Associations ("PCFFA") filed suit in this Court challenging the BOR's 2000 Plan under the ESA. On April 3, 2001, this Court granted PCFFA's motion for summary judgment and found that the BOR failed to comply with the requirements of the ESA before implementing its 2000 Operations Plan for the Klamath Project." *See Pacific Coast Federation of Fishermen's Association v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d at 1228, 1243, 1247 (N.D. Cal. 2001). The Court therefore determined that an injunction was appropriate and enjoined the BOR from sending water irrigation deliveries from the Project if the flows dropped below the minimum flows recommended in the Hardy Phase I Report. *See id.* at 1250. By its terms, the injunction was to expire when the BOR adopted a plan which met the requirements of the ESA.

On April 6, 2001, three days after the Court issued its Order, the NMFS issued a biological

---

[1] "Anadromous" fish species spend portions of their lives in both fresh and salt water.

[2] In November 2001, Dr. Hardy released the draft version of the Phase II Report (the "Hardy Phase II Report"). That version included site-specific studies and further analysis.

4

opinion ( the "2001 NMFS Biological Opinion") discussing the on-going impact of the Project on, *inter alia*, coho salmon. The 2001 NMFS Biological Opinion concluded that the low flow levels proposed by the BOR for 2001 were likely to jeopardize the continued existence of the coho salmon and adversely modify their habitat. The NMFS proposed a "reasonable and prudent alternative" for the Project's operations including minimum flow levels the NMFS believed were necessary to avoid jeopardizing the coho salmon.

In December 2001, the Department of the Interior and the Department of Commerce, sought review of the 2001 NMFS Biological Opinion and the FWS biological opinion by the National Research Council ("NRC"), an arm of the National Academy of Sciences. The NRC convened a Committee on Endangered and Threatened Fishes in the Klamath River Basin, which consisted of twelve independent scientists and scholars (the "NRC Committee"). The NRC Committee conducted hearings and received opinions and evidence from other individuals affected by the Project or those knowledgeable in the field, including a member of the PCFFA and Dr. Hardy.[3] A report was prepared and circulated to nine independent reviewers for additional comment and critique. Finally, it was subject to a further independent examination by two external reviewers.

On February 6, 2002, the NRC Committee issued its "Prepublication Copy, Interim Report, Scientific Evaluation of Biological Opinions on Endangered and Threatened Fishes in the Klamath River Basin (2002)," (the "NRC Report"). The NRC Report recognized that "the reduction in stocks of native coho salmon in the Klamath River Basin has been caused by multiple interactive factors." Changes in the physical habitat associated with inadequate flows and water temperature were cited as examples. However, the NRC Report found that there was not a sufficient basis to support the proposed flows in the 2001 NMFS Biological Opinion. The NRC Report also found that higher flows might disadvantage the young coho salmon between July and September because the additional flows would include water that had been warmed in retention lakes. High water temperature was found to be one of the reasons for the decline of coho salmon. The NRC Report also questioned whether the increased flows might have a detrimental effect upon thermal refugia, which was determined to be critical to the

---

[3] The NRC Committee did not consider the Hardy Phase II Report which was only in draft form at the time.

5

coho salmon's habitat.

While the NRC Report did not find scientific support for the minimum flows proposed by NMFS, the NRC Report also found that the BOR's proposal in its 2001 biological assessment could not be justified. The NRC Report concluded that the BOR's 2001 biological assessment "could lead to more extreme suppression of flows than has been seen in the past, and cannot be justified either." Overall, the report concluded that "there is no convincing scientific justification at present for deviating from flows derived from operational practices in place between 1990 and 2000."[4]

On February 25, 2002, the BOR issued its multi-year "Final Biological Assessment: The Effects of Proposed Actions Related to Klamath Project Operation (April 1, 2002-March 31, 2012)" (hereinafter "the 2002 Biological Assessment"). In accordance with the findings of the NRC Report, the BOR's 2002 Biological Assessment proposed flows that were intended to mimic the operational practices for the ten year period beginning with 1990.

On February 27, 2002, the BOR initiated formal consultation with the NMFS concerning its 2002 Biological Assessment. The NMFS indicated that its biological opinion reviewing the 2002 Biological Assessment would not likely be completed until June 2002. In light of the fact that the NMFS was not likely to release its report prior to the spring operations, on March 27, 2002, the BOR issued an interim operating plan for April through May, 2002 (the "2002 Interim Operating Plan"). The 2002 Interim Operating Plan proposed minimum flows that were consistent with those in the 2002 Biological Assessment.

Based upon the BOR's 2002 Interim Operating Plan, on April 24, 2002, Plaintiffs PCFFA,

---

[4] Subsequent to the release of this report, the NMFS sent a letter to NRC requesting clarification. Specifically, the NMFS inquired whether the NRC "considered the benefits of increased flows in the spring, when temperature is not a limiting factor." On April 30, 2002, the NRC issued a letter in response to the NMFS' request for clarification. The NRC stated in its clarification letter that it "did consider whether there would be benefits to fry from increased spring flows." It recognized that the concerns about increased water temperature were not present in relation to the spring flows. However, the NRC asserted that it found "other weaknesses in the arguments for increased flows" and that the "projected increases in habitat for the fry seemed, in the opinion of the committee, quite modest at best." The NRC also found it unlikely that the coho salmon are "saturating the main stem habitat" or that the main stem was a significant rearing area for the coho salmon. Thus, the NRC's letter reaffirmed its conclusion that there was no convincing evidence to support the minimum flows proposed in the NMFS's 2001 biological opinion. However, the NRC acknowledged that the conclusions regarding the benefits of increased flow levels might be correct pending more research and studies.

Institute for Fisheries Resources, Northcoast Environmental Center, Klamath Forest Alliance, Oregon National Resources Council, the Wilderness Society, Waterwatch of Oregon, Defenders of Wildlife, Headwaters, and Representative Mike Thompson (hereinafter collectively referred to as "Plaintiffs") filed a Complaint in this matter along with a motion for a temporary restraining order. In the Complaint, Plaintiffs argued that, based upon the best science available, the Hardy Phase I report, the 2001 NMFS biological opinion, and the Hardy Phase II Report, a much higher minimum flow of water from the Iron Gate Dam than set forth in the 2002 Interim Operating Plan was necessary to avoid a negative impact upon the coho salmon. Plaintiffs sought a temporary restraining order preventing the BOR from restricting the flow to those levels in the BOR's 2002 Interim Operating Plan, and mandating minimum flows in accordance with the Hardy Phase II Report. Plaintiffs also argued that the BOR had not completed a formal consultation with the NMFS as required under the ESA and that the putative informal consultation was invalid. Alternatively, Plaintiffs asserted that, even if the informal consultation was valid, the NMFS' concurrence with the 2002 Interim Operating Plan violated the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, because it was arbitrary, capricious, and contrary to law.

In an Order filed May 22, 2002, this Court denied Plaintiffs' motion for a temporary restraining order. Although the Court concluded that the BOR failed to satisfy the procedural consultation requirements of the ESA, the Court found that the BOR could proceed with its 2002 Interim Operating Plan pursuant to ESA § 7(d), which allows an agency to proceed with its proposed action prior to completing consultation if it is determined that the activity would not irreversibly or irretrievably commit resources which would foreclose the development of an RPA. In its Order, the Court approved the BOR's use of the NRC report as the best science available, and declined to rely on the Hardy Phase II Report as the best science, since that report existed only in draft form.

While the validity of the 2002 Interim Operating Plan was being litigated in this Court, the NMFS continued to assess the validity of the BOR's 2002 Biological Assessment and produced drafts of its biological opinion. On April 23, 2002, April 29, 2002, and April 30, 2002, the NMFS and the BOR met regarding the most recent version of the draft biological opinion, which proposed specific flow rates that were higher than those proposed in BOR's 2002 Biological Assessment. The BOR proposed

7

that it should be responsible for the remedy to the extent that coho are harmed as a result of the Klamath Project. *Id.* Specifically, the BOR proposed that it should be responsible for providing 57 percent of the flows proposed in the draft biological opinion, based on the fact that 57 percent of the irrigable acres in the upper Klamath Basin are irrigated by Project contractors. *Id.* Although the NMFS noted that providing 57 percent of what was recommended as the appropriate target flows might be insufficient to avoid jeopardizing the coho, and therefore would not constitute a viable RPA, the NMFS also noted that "[t]his problem was resolved when [BOR] agreed that it would use its authorities to establish a multi-agency task force/working group, comprising Federal, State, Tribal and, where possible, local agencies an interests, to develop the other 43 [percent] of the flows identified in the RPA."

On May 31, 2002, the NMFS issued its final biological opinion (the "2002 Biological Opinion"). The 2002 Biological Opinion concluded that the BOR's proposed action contained in the 2002 Biological Assessment was "likely to jeopardize the continued existence of SONC coho salmon" and was "likely to adversely modify critical habitat for the SONC coho salmon." The NMFS then proposed an RPA that could be implemented by the BOR that would avoid the likelihood of jeopardizing the existence of the coho salmon or adversely modifying their critical habitat. The RPA consists of the following elements: (1) specific water management measures over a ten-year period; (2) a water bank and water supply enhancement program to provide flows to the Klamath River below Iron Gate Dam; (3) an agreed-upon long-term flow target to be achieved by 2010; (4) an inter-governmental task force – the Conservation Implementation Committee – to develop, procure, and manage water resources; and (5) an inter-governmental science panel to develop and implement a research program to identify and fill gaps in existing knowledge regarding coho and their habitat requirements during various life history states and water year types.

The program elements set forth in the 2002 Biological Opinion were to take effect in various degrees during three phases. Phase I covered the years 2002 through 2005. During this time, the RPA required the BOR to: (1) lay the ground work for gaining cooperation of Oregon, California, and Klamath River Tribes; (2) establish a scientific panel to guide investigations to address issues identified in the interim and final NRC committee reports on threatened and endangered fishes in the Klamath River Basin; (3) begin to develop water supplies devoted to increasing flows in the Klamath River below

8

Iron Gate Dam; and (4) provide the minimum flows identified in BOR's 2002 Biological Assessment, as modified on an annual basis by agreed upon use of the water bank for improved spring and/or summer flows.[5] In Phase II, covering the years 2006 through 2010, the BOR is to (1) maintain a waterbank of 100 thousand acre-feet; (2) contribute 57 percent of the long-term RPA flow to the river below Iron Gate Dam or the flow identified in its Biological Assessment, whichever is greater; (3) implement non-flow mitigation measures in cooperation with the Conservation Implementation Program; and (4) continue to conduct investigation to refine RPA flows and relationship between flow and coho survival. In Phase III, covering years 2010 through 2011, the NMFS expects that implementation of the Conservation Implementation Program will have achieved the long-term flow targets set forth in the RPA.

Between September 20, 2002 and September 27, 2002, approximately 33,000 chinook, coho, and steelhead salmon died in the Klamath River.

On September 25, 2002, Plaintiffs filed a First Amended Complaint in this action against the BOR and the NMFS (collectively "the Federal Defendants"). On October 22, 2002, Yurok Tribe filed a motion to intervene; on November 22, 2002, the Water Users filed a motion to intervene; and on December 19, 2002, Hoopa Valley Tribe filed a motion to intervene. The Court granted these motions to intervene in an Order filed February 4, 2003.

On July 15, 2003, this Court ruled on the parties' motions for summary judgment and held that Phases I and II of the RPA, or the short-term measures, were not arbitrary and capricious. However, the Court found the requirement that the BOR provide only 57 percent of the long-term flows to be arbitrary and capricious. The Court concluded that the NMFS had inappropriately considered the effects of actions that were not "reasonably certain to occur" when it determined that the coho would receive 100 percent of the flows through a collaborative process. The Court ordered NMFS to revise its 2002 Biological Opinion to address the deficiencies identified in Phase III of the RPA, but specified that the 2002 Biological Opinion and the RPA would remain in effect until a revised Biological Opinion was

---

[5]In 2002, in addition to the flows proposed by the Biological Assessment for a below average year, BOR was to provide 30,000 acre-feet of water. In 2003 through 2005, in addition to the flows proposed in the 2002 Biological Assessment, BOR was to provide an additional 50,000, 75,000, and 100,000 of acre-feet of water, respectively.

9

issued.

On September 12, 2003, Plaintiffs appealed the Court's determination that Phases I and II of the RPA were not arbitrary and capricious.[6] On appeal, Plaintiffs challenged the flow levels established in Phases I and II, arguing that the Phase I flows were the same flows rejected by the NMFS as insufficient in its review of the BOR's biological assessment and that the Phase II flows provided only 57 percent of the flows that the NMFS recognized the coho required.

On October 18, 2005, the Ninth Circuit issued its opinion reversing this Court's determination regarding Phases I and II of the biological opinion. The Ninth Circuit found that the RPA was arbitrary and capricious because it failed to analyze the effects of eight of ten years of the proposed action on the SONCC coho salmon, a species with a three-year life cycle. The Ninth Circuit remanded the case to this Court with explicit instructions for this Court to craft the appropriate injunctive relief.

Accordingly, on January 13, 2006, Plaintiffs filed a Motion for Injunctive Relief.

On March 27, 2006, the Court issued an Order granting Plaintiffs' Motion for Injunctive Relief. The Court ordered defendants NMFS and the BOR to reinitiate consultation on the Klamath Irrigation Project. The Court also ordered NMFS to issue a new biological opinion and to provide copies to Plaintiffs and the Court when completed. Additionally, the Court ordered the BOR "to limit Klamath Project irrigation deliveries if they would cause water flows in the Klamath River at and below Iron Gate Dam to fall below 100% of the Phase III flow levels specifically identified by the NMFS in the Biological Opinion as necessary to prevent jeopardy . . . until the new consultation for the Klamath Irrigation Project is completed and reviewed by this Court."

On April 7, 2006, Defendant-Intervenors filed the instant Motion for Reconsideration. On April 10, 2006, the Federal Defendants filed the instant Federal Rule of Civil Procedure 59(e) Motion to Alter or Amend Judgment, or, in the Alternative, Motion for Leave to File Motion to Reconsider (collectively referred to herein as the "Motions for Reconsideration").

## **LEGAL STANDARD**

Where a court's ruling has resulted in a final judgment or order, a motion for reconsideration or

---

[6]On September 26, 2003, the Federal Defendants cross-appealed the decision to strike down Phase III. However, they voluntarily dismissed the appeal prior to briefing.

10

to amend judgment may be based on Rule 59(e) of the Federal Rules of Civil Procedure. "'[T]he major grounds that justify reconsideration involve an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989) (quoting *United States v. Desert Gold Mining Co.*, 433 F.2d 713, 715 (9th Cir. 1970)). A motion to alter or amend judgment under Rule 59 must be made within ten days of entry of judgment. See Fed. R. Civ. P. 59(e).

## **ANALYSIS**

In the instant Motions for Reconsideration, Defendant-Intervenors and the Federal Defendants (collectively, "Defendants") request that the Court amend its March 27, 2006 Order so that the injunction expires when the new biological opinion for the Klamath Irrigation Project is completed, *not* when it is reviewed by this Court. The Motions for Reconsideration are filed pursuant to Federal Rule of Civil Procedure 59(e)[7] on the grounds that the Court clearly erred when it required the NMFS to submit its new biological opinion to the Court.

Defendants have convincingly established that amending the March 27, 2006 Order is appropriate and just. While Plaintiffs are generally correct that this Court has broad latitude in fashioning the appropriate equitable relief, *see Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994), Defendants have shown that amending the Order to omit the requirement that the new biological opinion be submitted to the Court will ensure that the injunctive relief fashioned by this Court is consistent with the provisions of the Endangered Species Act ("ESA") and its underlying policies.

Pursuant to section 1540(g) of the ESA, a citizen-plaintiff wishing to file suit against an alleged ESA violator must provide the Secretary of the Interior and the alleged ESA violator with written notice

---

[7] Defendants contend that they are not subject to the requirements of Local Rule 7-9. When filing a motion for reconsideration under Civil Local Rule 7-9, the moving party must specifically show: (1) that at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the court before entry of the interlocutory order for which the reconsideration is sought, and that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or (2) the emergence of new material facts or a change of law occurring after the time of such order; or (3) a manifest failure by the court to consider material facts which were presented to the court before such interlocutory order. *See* Civil L.R. 7-9(b). As is clear from the plain language of the rule, Local Rule 7-9 applies to "interlocutory orders," not final judgments such as the Court's March 27, 2006 Order. As such, Defendants are correct that they did not have to file their Motions pursuant to Local Rule 7-9.

11

of the alleged violations sixty days prior to initiating suit in district court. *See* 16 U.S.C. § 1531. Compliance with section 1540(g) is jurisdictional in nature and is to be strictly enforced. *See Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998); *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1072 (9th Cir. 1996). Under the terms of the existing injunctive order, however, this Court may review the new biological opinion without the need for Plaintiffs to comply with Section 1540(g). As such, the current structure of the injunctive relief substantially undermines the purpose of the sixty-day notice, which is to give the Secretary and the alleged violator an opportunity to remedy the alleged violations *before* litigation commences. *Marbled Murrelet*, 83 F.3d at 1072.[8] It also undermines the presumption of regularity to which the BOR is entitled. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415 (1971) (agency decision is entitled to a presumption of regularity), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977); *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.") (citations omitted).

Moreover, the Ninth Circuit has consistently held that a claim is moot where the challenged agency action or decision has been superceded by a new agency action or decision. *See Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1096 (9th Cir. 2003); *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997) (specifically finding that issuance of new biological opinion rendered previous challenge to old biological opinion moot). This is due to the fact that the superceded agency action or decision has no continuing legal consequences that establish a case or controversy and "is true even if the superseded B[iological Opinion] originally covered a time period that included the date of the litigation." *Forest Guardians*, 329 F.3d at 1096.

Finally, amending the Order to omit the subsequent mandatory review by the Court eliminates the need for further Court intervention, thereby furthering the objectives of Congress and conserving

---

[8]Plaintiffs argue that the sixty-day notice requirement does not apply because "challenges to completed biological opinions . . . arise under the Administrative Procedures Act ('APA'), and require no written notice." However, as Defendants correctly note, the injunctive relief as currently structured is far broader because it prevents the BOR from relying upon a new biological opinion issued by the NMFS until the Court has reviewed it. This falls within the scope of the ESA and thus triggers the notice period requirement. *See Southwest Ctr. for Biological Diversity*, 143 F.3d at 519-20.

12

scarce judicial resources. As stated by the Ninth Circuit in *Southwest Center for Biological Diversity*, 143 F.3d at 520:

> The purpose of the 60-day notice provision is to put the agencies on notice of a perceived violation of the statute and an intent to sue. When given notice, the agencies have an opportunity to review their actions and take corrective measures if warranted. The provision therefore provides an opportunity for settlement or other resolution of a dispute without litigation.

*Id.* (quoting *Forest Conservation Council v. Espy*, 835 F.Supp. 1202, 1210 (D. Id. 1993). Indeed, when discussing a similar sixty-day notice period requirement in the Resource Conservation and Recovery Act ("RCRA"), the United States Supreme Court expressly found that the notice requirement furthers the goals of Congress by appropriately allowing the Governmental *agencies* to take responsibility for enforcing environmental regulations. *Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989); *see Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988) (noting that the notice provisions of RCRA and ESA should be construed identically). Accordingly, Defendants have sustained their burden of proving that the Court's March 27, 2006 should be amended so that the injunction expires upon the completion of a new biological opinion.

## **CONCLUSION**

IT IS HEREBY ORDERED THAT Defendant-Intervenor's Motion for Reconsideration [Docket No. 453] is GRANTED. The Federal Defendants' Motion to Alter or Amend Judgment [Docket No. 454] is also GRANTED.

IT IS FURTHER ORDERED THAT the Court's March 27, 2006 Order is AMENDED as follows: (1) the phrase "and to the Court when it is completed" at page 14, line 12 is DELETED; and (2) the phrase "and reviewed by this Court" is DELETED from page 14, line 18.

IT IS SO ORDERED.

Dated: 5/24/06

SAUNDRA BROWN ARMSTRONG
United States District Judge